Dorofey, Appellant, *v.* Bethlehem Steel Company.

Argued March 13, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*H. Clifton McWilliams, Jr.*, with him *Benjamin Hinchman, III*, and *McWilliams, Margolis & Coppersmith*, for appellants.

*Gilbert J. Helwig*, with him *Francis A. Dunn*, and *Reed, Smith, Shaw & McClay*, for appellee.

OPINION PER CURIAM, May 3, 1962:

Judgments affirmed on the opinion of WOLFE, J., which is reported in 26 Pa. D & C. 2d 674.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the morning of November 14, 1956, Algerd A. Bender and Cenifon Dorofey, employees of the Industrial Pipe Cleaning Company, entered into a large pipe or aqueduct (7 feet 7 inches high and 6 feet wide) beneath the plant of the Bethlehem Steel Company in Johnstown, for the purpose of recovering a "drag", a cleaning device, which had become stuck during the cleansing of the aqueduct which carries off industrial waste and storm waters from the steel plant and empties them into the Conemaugh River. The men were never seen again alive.

When an hour or so had passed after they had entered into the aqueduct, and they did not reappear, Dorsey Dorofey, brother of Cenifon, entered into the aqueduct to look for them. He found their dead bodies close to what has been designated as a "lateral", that is, a pipe 36 inches in diameter, opening into the main line. Water pours through this "lateral" into the main line in order to give the stream in the latter conduit vigorous motion and speed in bearing away the impurities and debris dumped into it from the plant's operations.

Dorsey Dorofey discovered that at this point where the lateral pipe connects with the main line, the water

ran so swiftly that he could scarcely maintain equilibrium and had to hold on to a cable to prevent being thrown off his feet.

From these and other facts learned about the happening of the tragic accident, Dolores M. Dorofey, administratrix of the estate of Cenifon Dorofey, and Julia Bender, administratrix of the estate of Algerd A. Bender, concluded that the deaths of their respective husbands were caused by the negligence of the Bethlehem Steel Company in not notifying the men of the agitation of the water at the point of the lateral, since they were unfamiliar with the inner operation of the subterranean channel in which they were working. They accordingly brought death and survival actions against the Bethlehem Steel Company. When the causes came to trial, the trial court entered compulsory nonsuits against the plaintiffs and they have appealed to this Court. The Majority of this Court has affirmed the nonsuits on the opinion of the court below, thus adopting it as its own. Accordingly, in this Dissenting Opinion I will refer to that Opinion as the Majority Opinion of this Court.

The Majority Opinion cites Section 343 of the Restatement, Torts: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein . . ." and then says that this provision cannot apply to this case "because the defendant neither knew nor had reason to know that these men would be down in the sewer at this time and place." John W. Colbert, Superintendent of the Mechanical Department of the defendant company, and who had direct responsibility

for the care and maintenance of the cleansing system, testified: "Q. Mr. Colbert, you knew the men were working in this general area at the time, did you not? A. That is right. Q. Did you know of that possibility that they would enter the line? A. Oh, I would think that there could be a possibility and some reason they may want to go into it."

Although Colbert knew that the men might go into the main line (also referred to as a sewer) for the purpose for which they did enter, he did not warn them, as he was required to do, of the dangers involved in getting close to the 36-inch lateral with its swift invasion of waters which could bowl them over in the large main pipe where drowning would be almost inevitable.

Section 341 of the Restatement, Torts provides: "A possessor of land is subject to liability to licensees, whether business visitors or gratuitous licensees, for bodily harm caused to them by his failure to carry on his activities with reasonable care for their safety, unless the licensees know or from facts known to them, should know of the possessor's activities and of the risk involved therein."

There was no evidence that Bender and Dorofey knew of the lateral with its rapid current, but there is evidence that the defendant knew of the danger lurking in the vicinity of the lateral. In spite of this knowledge, the defendant made no effort to acquaint the working men with the hazard which could cost them their lives. Mr. Colbert testified: "Q. As the Superintendent of the Mechanical Department, *did you have the direct responsibility for the care and maintenance of that particular sewer that is in question today? A. I did.* Q. That was under your supervision? A. That is correct. . . . Q. *Did you give them or Mr. Cenifon Dorofey any warning as to the speed of flow at the lateral at the point where the bodies were later found, or warning of the laterals at that point? A. We did*

*not.* . . . Q. And you gave no instructions as far as where the water came from, what waters there were, where they went, or the speed of flow in the line? A. That's right." (Emphasis supplied)

With these two quotations from the record, it is manifest that the defendant company violated the standard of care impressed on it by the Restatement of Torts, and it would seem to me, in the face of this highly incriminating evidence against the defendant, that the Majority would find itself hard pressed to explain the nonsuits entered in the case. The Majority attempts that rather difficult task by asserting: "We know that these men were drowned in the sewer but we do not know what caused them to drown."

Of course, the Angel of Death did not testify in court as to the precise manner in which the men drowned, but it would take no supernatural rationalization on the part of the jurors to conclude that the men drowned because they were swept from their bearings by the racing waters coming into the "sewer" from the lateral.

The Majority embarks on a lively stream of speculations as to what may have caused the tragedy. It says: "It may have been the force of the water which upended them, or they may have stumbled on the rock-strewn floor of the sewer, or their crow bars or rope may have tripped them, or they may have fallen while attempting to dislodge an obstruction, or they might have been momentarily overcome by sulphur dioxide and sunk into the water."

An expert medical witness testified that post-mortem examinations revealed that the men had not been injured or had they succumbed to gas. The cause of death was given as drowning. The expert witness could offer no opinion on sulphur dioxide, but this, as a cause of death, can be ruled out readily because such sulphur dioxide, if it was present, did not affect Dorsey Doro-

fey when he went into the water looking for his brother and Bender.

The Majority is simply on an imaginary excursion when it speaks of the men stumbling or tripping over crowbars and ropes or attempting to dislodge obstructions. These are all possibilities, of course, but they are all conjurations without a body or name. Assuming that they fall within the realm of possibility, which is the most boundless and amorphous concept in the realm of intellectual exercise, they certainly are possibilities of fancy far less likely to be clothed with the realism of fact than the substantial evidence submitted by the plaintiff which explains that the men were knocked down by the momentum of the waters cascading through the lateral, of which they had no advance knowledge and against which they could not, therefore, build up, in anticipation, any self-defense. Dorsey Dorofey testified: "Q. Were you able to stand in it at the point where you found your brother's body? A. It wasn't too good of a footing there. The footing wasn't too good. It was too swift to stand up. Q. Was it too swift to stand? A. Yes. Q. *And what could you observe from your observation, right at that point, was the reason for this swiftness of the water that you could observe?* A. *I would say from the water coming out from the other line.* Q. *That is from the lateral?* A. *Yes.*" (Emphasis supplied)

Nor did Dorsey deviate from this physical observation in cross-examination: "Q. Now, when you got in, did you notice right away that the water was fairly swift? A. It was rough going in there all the way. It was worse yet at that hole. It was worse there at that inlet."

In redirect examination Dorsey testified: "Q. At the point where you found your brother's body, what was the condition of the water? A. Well, it was colder, I believe. Q. *Could you stand up in it?* A. *No, I couldn't stand up in it.*" (Emphasis supplied)

The Majority makes the usual stereotyped observation that in considering a motion to take off a compulsory nonsuit it will "view the evidence together with all reasonable inferences therefrom, in the light most favorable to the plaintiffs." But it must be obvious from the testimony I have quoted (and which was not refuted at the trial) that "the light most favorable to the plaintiffs" to which the Majority adverts comes from a rather feeble lamp of appraisal.

The kind of light which *should* be used in considering a nonsuit, is one which illumines stark realism and does not throw shadows of fantasy. Such a light proclaims that the testimony of Dorsey Dorofey not only raises an inference supporting the position of the plaintiffs, namely, that Bender and Cenifon were drowned because of the surging influx of waters at the point of the inlet to the main line, but it offers the only plausible explanation as to what caused the workmen to die. The Majority, instead of adhering to the substantial evidence presented by the plaintiffs, much of it through the superintendent of the defendant company itself, engages in fanciful speculation about stumbling, tripping and sulphur dioxide of which there is not an air bubble of evidence in the case.

Of course, the original fault for this unjust nonsuit lies with the trial judge who allowed himself to be mystified by the circumstances and then, seeing no way out of his self-created perplexities, decided that no one else could find the exit either. He thus took the case away from the jury, but he had no right to do this, if he had abided by the authority of our decision in the case of *Smith v. Bell Telephone Company*, 397 Pa. 134, where Justice McBride, speaking for the Court, wisely and justly said: "The right of a litigant to have the jury pass upon the facts is not to be foreclosed just because the judge believes that a reasonable man might properly find either way. A substantial part of the right to

trial by jury is taken away when judges withdraw close cases from the jury."

In trying to explain to himself how the accident in this case occurred the trial judge invented possibilities of which there was no evidence and treated as of insignificance the one possibility on which there was considerable evidence. In the case of *Mayberry v. Blue Ridge Soil Pep, Inc.,* 402 Pa. 264, we said that: "When there are two theories as to how an accident happened, one imposing liability on the defendant and the other excluding it, it is for the jury to decide which theory is so bolstered by fact, logic, credibility of witness and natural sequence of events that it predominates in probability over the other. The court may not take the decision away from the jury unless the evidence, on the high plateau of incontrovertibility, so dominates the horizon of credibility that it excludes to a moral certainty the theorem of liability."

It is not evident to me how the postulate of nonliability here so outweighs the facts from which liability flows, as to justify the drastic judgment of a nonsuit, which denies the plaintiff a finding on the facts by the tribunal constitutionally mandated to ascertain the facts, namely, the jury.

The reasoning of the Majority would seem to be that the plaintiffs must prove that the *only* reasonable inference is that defendant's negligence was the proximate cause of the accident. That is not the law as laid down by this Court. In *Lear v. Shirk's Motor Express Corporation,* 397 Pa. 144, we said: "A plaintiff is entitled to have his case considered by the jury even though he does not show that the only reasonable inference is that defendant's negligence was the proximate cause of the accident. It is enough that he produces evidence which may properly be found by the jury to justify an inference that the defendant's negligence was the proximate cause of the accident because

such evidence outweighs even though it does not *exclude* an inference that the defendant was not negligent or that his negligence was not the proximate cause of the accident." (Emphasis in original).

As I read the record in the case at bar the theory of non-liability on the part of the defendant seems an unreasonable possibility while the theory of liability is a reasonable possibility. In *Mayberry v. Blue Ridge Soil Pep, Inc.,* supra, 402 Pa. 264, we said : ". . . if the theory of non-liability moves over the dark road of an unreasonable possibility while the theory of liability proceeds over a well-lighted road of acceptable explanation of the accident, it would be unwise and illogical to follow the dark road instead of the lighted one. In any case, it is for the jury to decide which road is more likely to lead to a reasonable revelation of what occurred."

I would reverse the action of the lower court and send the case back to let the jury determine the issue, so that we may be sure that the road which led to a nonsuit was not a road which ended in injustice.