Jonathan C. PHILLIPS, by Mari
B. PHILLIPS, his attorney
in fact, Appellants

v.

WASHINGTON COUNTY TRANSPOR-
TATION AUTHORITY; Oscar V.
Cole; Southwestern PA Area Agency
on Aging, Inc.; Rubin Sabatine; and
Washington County Aging Services.

Commonwealth Court of Pennsylvania.

Argued Oct. 13, 2009.

Decided Dec. 14, 2009.

Laura Duncan Phillips, Washington, for appellants.

Dara A. DeCourcy, Greensburg, for appellee, Washington County Transportation Authority.

Jesse A. Torisky, Pittsburgh, for appellee, Southwestern PA Area Agency on Aging, Inc.

Edmond R. Joyal, Jr., Pittsburgh, for appellees, Rubin Sabatine and Washington County Aging Services.

BEFORE: SIMPSON, Judge, and FRIEDMAN, Senior Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Jonathan C. Phillips, (Appellant), by Mari B. Phillips, (Phillips) his attorney in fact, appeals from an order of the Court of Common Pleas of Washington County (trial court) which, on September 19, 2008, granted the motions for summary judgment filed by Washington County Transportation Authority (WCTA), Southwestern Pennsylvania Area Agency on Aging, Inc. (SPAAA), Rubin Sabatine (Sabatine), and Washington County Aging Services (WCAS), to counts I, III, IV, and V of Appellant's amended complaint and dismissed such counts; and from the order of the trial court which, on February 4, 2009, granted the motion to discontinue with prejudice as to Appellee, Oscar V. Cole (Cole).[1] We affirm.

Appellant was born in 1974 and at the time of the events giving rise to his claims, he was thirty-one years old. Appellant suffered from mild mental retardation since infancy due to physical abuse inflicted by his biological parents. He was adopted by Mari and David Phillips in 1982. Immediately prior to the motor vehicle accident on April 15, 2005, Appellant was able to live virtually independently. He lived alone and was able to care for himself in most respects, to include bathing himself and preparing simple meals without a stove. Appellant participated in the Special Olympics and cared for a pet. Appellant had an IQ of 57. He was unable to maintain a bank account and was virtually unable to read and write. Appellant did not and never has had a driver's license.

In 2002, Appellant began working for The Woods Quality Cabinetry Company in Eighty–Four, Pennsylvania, which was approximately twenty miles from his home. Due to his inability to drive, Phillips entered into an oral agreement with WCTA to transport Appellant every working day from his home to his workplace in the morning and from his workplace to his home every evening.

On June 29, 2004, WCTA entered into a contract with SPAAA regarding the provision of transportation services to "the general public, persons with disabilities, to senior citizens age 65 and over, to persons receiving medical assistance, and to low income individuals for child care and employment purposes." WCTA/SPAAA Agreement (Agreement), at 1; Repro-

---

1. Count II of Appellant's amended complaint was directed to Cole, who did not move for summary judgment. Appellant does not raise any issues before this court regarding Cole or the trial court's order of February 4, 2009.

duced Record (R.R.) at 40a. The contract provided that:

III.  SCOPE OF WORK

A.  Services to be Provided

[SPAAA] shall deliver transportation services as directed by WCTA.

[SPAAA] shall deliver all trips assigned to it by WCTA, including wheelchair trips, and [SPAAA] shall supply sufficient vehicles and personnel as necessary to meet WCTA's needs and render said services on such days and such hours as directed by WCTA.

*    *    *

In addition to supplying a sufficient number of vehicles and trained drivers, [SPAAA] shall employ or engage adequate management and support personnel to assure WCTA of continuous, reliable services (during normal weather conditions) and shall provide dispatching services and radio communication with [SPAAA] vehicles and telephone communication with WCTA at all times regular service is being provided. . . .

*    *    *

B.  Training

[SPAAA] shall ensure that all employees and contracted personnel engaged in service delivery are "trained to proficiency." Specifically [SPAAA] shall ensure that the drivers, dispatchers, supervisors, and managers assigned to this project must meet the minimum training standards as reasonably established by WCTA, and any additional training as required by WCTA. All training costs shall be the [SPAAA]'s responsibility.

*    *    *

IX.  OPERATING STANDARDS

The [SPAAA] shall render transportation in accordance with the following operating standards and procedures:

1.  [SPAAA] shall at all times render safe, courteous service in accordance with all applicable laws, ordinances, and regulations.

*    *    *

15.  Service to be provided is door-to-door. This means that WCTA passengers who need and request assistance shall receive it, between the door of the passenger's pick-up point and the door of the vehicle. Assistance includes help with small packages. It does not include lifting a passenger, going into a residence, or taking a wheelchair up or down steps.

Agreement at 2–7; R.R. at 41a–46a. The contract further provided that SPAAA "at all times shall be an independent contractor," and that SPAAA "shall indemnify, protect and hold ... WCTA ... harmless" relative to claims arising out of its provision of transportation services pursuant to the contract. Agreement at 11, 14; R.R. at 50a, 53a.

On July 1, 2004, WCAS entered into a contract with SPAAA regarding the provision of transportation services to citizens of Washington County. That contract provided that WCAS would:

deliver transportation services as directed by WCTA/ [SP]AAA and provide all trips assigned, including wheelchair trips. [WCAS] shall supply sufficient vehicles and personnel as necessary to meet the consumer needs and render said services on such days and such hours as directed by WCTA/ [SP]AAA.

WCAS/SPAAA Contract (Contract) Amendment at 1; R.R. at 99a. The contract further provided that "WCTA/[SP]AAA shall be responsible for all customer registration, trip reservation,

and trip scheduling functions." *Id.* Also pursuant to the contract, WCAS would supply trip manifests, assign trip requests, remove any driver or other employee employed pursuant to the agreement, establish training standards for drivers, dispatchers, supervisors, and managers, investigate accidents at its discretion, receive consumer complaints, furnish driver name tags, establish guidelines for the preparation of driver reports and passenger surveys, determine which vehicles would be used to provide transportation services, and conduct driver training workshops. *Id.* at 1–9; R.R. at 99a–107a. It further provided that WCAS would indemnify SPAAA for claims arising out of WCAS's performance pursuant to the contract. *Id.* at 10–11; R.R. at 108a–109a.

On April 15, 2005, Appellant was transported from his place of employment to his home in a vehicle, most likely owned by WCTA, as it had the WCTA markings on the side. Such vehicle was driven by Sabatine, an employee of WCAS, and had only one other passenger aboard. Sabatine drove toward Appellant's home utilizing the southbound lane of State Route (S.R.) 231. Sabatine testified that as he approached Appellant's home, Appellant "said just let me out here, Rubin, because Kerri has to get home right away." Notes of Testimony (N.T.) at 24; R.R. at 499a. Sabatine parked the vehicle in the southbound lane of S.R. 231, across the street from Appellant's home, and watched as Appellant exited the vehicle.[2] According to Sabatine, Appellant had already walked onto his property when Sabatine advised Appellant that he had dropped his sweater next to the vehicle.[3] As Sabatine was attending to another passenger in the vehicle, he heard a "thud" and observed Appellant behind his vehicle. Sabatine's vehicle remained parked at all times during this incident. Sabatine got out of his vehicle and discovered that a vehicle operated by Cole, driving in the northbound lane of S.R. 231, had hit Appellant.

Appellant suffered a pelvic fracture, coccyx fracture, broken nose, and severe injuries to his mouth and teeth. Appellant remained in various hospitals for approximately two weeks, and recuperated in his parents' home for several months. Appellant also suffered permanent neurological impairment as a result of a traumatic brain injury sustained in the accident. Appellant's IQ prior to the accident was 57, after the accident his IQ was 48. N.T. at 27; R.R. at 399a. Appellant is unable to care for himself, is unable to live independently, and it has been stated that he will be unable to live independently in the future.

2. Mary Lynn Spilak (Spilak), the public administrator of WCAS testified that the transportation service utilized by Appellant served impaired, unimpaired, old and young persons. That it was the policy to provide "door to door service" to passengers, that the driver would pick them up at their door, if needed, and push or walk them to the bus and even stand behind them as they boarded. Spilak further agreed that drivers were trained to drop passengers off at the front of the house so that they wouldn't have to cross the highway. N.T. at 36; R.R. at 459a. She also stated that it was against their policy to drop passengers off across a road from their homes. *Id.*

Prior to this incident, Sabatine had always picked Appellant up and dropped him off either directly in Appellant's driveway or at the end of his driveway, which driveway was adjacent to the northbound lane of S.R. 231. He did this in accordance with the training provided to him.

3. The facts are disputed regarding whether Sabatine stayed in the vehicle, walked Appellant across to his property, or whether Appellant dropped a sweater or had just gotten off the bus and was walking around from behind the bus when he was hit. It is also disputed as to whether Appellant made it onto his own property before returning to pick up his sweater.

N.T. at 31; R.R. at 403a. Appellant required twenty-four hour assistance with the activities of daily living for approximately three years after the accident and currently lives in a group home specializing in the care and rehabilitation of persons with traumatic brain injuries.

At the time of the accident Sabatine was employed by WCAS. WCTA owned the vehicle being operated by Sabatine, which contracted with SPAAA to provide transportation services. SPAAA subcontracted with WCAS to provide the actual transportation.

In August of 2005, Appellant appointed Phillips his general power of attorney. On October 27, 2008, Appellant was declared an incapacitated person and his parents were declared co-guardians of his person and estate.

Appellant filed writs of summons on April 11, June 15 and August 4, 2006, against WCTA, SPAAA, Sabatine, WCAS and Cole (Appellees). Those cases were consolidated by the trial court on August 8, 2006. After the close of discovery, Appellees, WCTA, SPAAA, Sabatine and WCAS, moved for summary judgment. Cole did not move for summary judgment. SPAAA and WCTA claimed immunity under what is commonly called the Political Subdivision Tort Claims Act (Tort Claims Act), 42 Pa.C.S. § 8541–8542 and the failure of the Appellant to impute vicarious liability on either Appellee. Additionally, Sabatine and WCAS raised immunity under the Tort Claims Act.

On September 19, 2008, after oral argument, the trial court granted all of the motions for summary judgment that were before it and dismissed Counts I, III, IV and V of Appellant's amended complaint. The trial court found that Appellant failed to demonstrate vicarious liability on the part of SPAAA and therefore did not reach SPAAA's argument that it was immune under the Tort Claims Act. The trial court then determined that WCTA was immune under the Tort Claims Act, as the Appellant was not injured by the operation of the vehicle. The trial court further found that WCAS was immune from suit under the Tort Claims Act, as the vehicle was not in operation at the time of the accident and finally, the trial court found that Sabatine was immune, as an employee who was acting within his official capacity, pursuant to the Tort Claims Act.

On February 4, 2009, upon motion of Appellant, the trial court discontinued the matter, with prejudice, as to Cole. This order of February 4, 2009, made final the order of September 19, 2008. Appellant appealed the matter to our court on March 4, 2009.[4]

Appellant contends that the trial court erred in granting the motions for summary judgment because the motor vehicle exception to the Tort Claims Act applies to the facts of this case and allows for the liability of all Appellees because the Appellant's injuries were caused by the operation of the vehicle in its transport of the Appellant to the side of the road opposite his home and that it was the SPAAA's duty to transport the Appellant on April 15, 2005, and that duty was non-delegable.[5]

---

4. Appellant appealed both orders, but does not raise any issues before our court as to the February 4, 2009 order regarding Cole.

5. Our scope of review for a grant or denial of a motion for summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion.

*Salerno v. LaBarr,* 159 Pa.Cmwlth. 99, 632 A.2d 1002 (1993). Summary judgment is only appropriate when, after examining the record in the light most favorable to the non-moving party clearly establishes that he is entitled to judgment as a matter of law. *Id.*

■ First, Appellant contends that the motor vehicle exception to the Tort Claims Act applies to the facts of this case, as Appellant's injuries were caused by the operation of the vehicle in its transport of the Appellant to the side of the road opposite his home.

The Tort Claims Act generally provides for the immunity of local agencies from suit.[6] A "local agency" is a "government unit other than the Commonwealth government." 42 Pa.C.S. § 8501. "Any political subdivision, municipal authority and other local authority, or any officer or agency of any such political subdivision or local authority" is a "government unit." 42 Pa.C.S. § 102. The Appellant has not contested that Appellees are considered "local agencies" within the purview of the Tort Claims Act.

Appellant contends that the motor vehicle exception to the Tort Claims Act should be applied because the factual cause of Appellant's injuries was the movement of the vehicle to the opposite side of the road from his home.[7] Appellant contends that Sabatine's action in discharging Appellant on the side of the road opposite his home forced him to traverse the northbound lanes of S.R. 231 and be struck by the vehicle operated by Cole; that the negligent discharge of Appellant by Sabatine on the side of the road opposite his home was the factual cause of his injuries.

The Superior Court has stated that the definition of factual cause in the Pennsylvania Suggested Standard Civil Jury Instructions is "a complete definition of factual cause." *Gorman v. Costello*, 929 A.2d 1208, 1213 (Pa.Super.2007). The Pennsylvania Suggested Standard Civil Jury Instructions provide in pertinent part as follows:

> In order for the plaintiff to recover in this case, the defendant's [negligent] [reckless] [intentional] conduct must have been a factual cause in bringing about harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.
>
> To be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as

---

**6.** The Tort Claims Act states that, "except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S. § 8541.

**7.** The motor vehicle exception to the Tort Claims Act states in pertinent part as follows:
(b) ACTS WHICH MAY IMPOSE LIABILITY.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
(1) Vehicle liability.—The operation of any motor vehicle in the possession or control of the local agency, provided that the local agency shall not be liable to any plaintiff that claims liability under this subsection if the plaintiff was, during the course of the alleged negligence, in flight or fleeing apprehension or resisting arrest by a police officer or knowingly aided a group, one or more of whose members were in flight or fleeing apprehension or resisting arrest by a police officer. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.
42 Pa.C.S. § 8542(b).

long as [his][her] own negligence is a factual cause of the injury.

Pa. S.S.J.I. (Civ) 3.15.

Appellant admits that there was an additional factual cause of Appellant's injuries, namely, Cole striking Appellant with his car. However, Appellant contends that the injuries would not have occurred absent Sabatine dropping Appellant off on the side of the road furthest from his home, necessitating his crossing S.R. 231 to get to his home.

Appellant argues that the Supreme Court and our court interpret the application of the motor vehicle exception of the Tort Claims Act too narrowly, and that this court needs to expand the definition of 'operation'.

In *Love v. City of Philadelphia*, 518 Pa. 370, 543 A.2d 531 (1988), the Supreme Court interpreted the term 'operation' of a motor vehicle. *Love* involved a transportation service administered by the city of Philadelphia that transported senior citizens between an adult center and their homes. Catherine Love, who was seventy-three years old and visually impaired, utilized the assistance of the vehicle's driver in boarding and disembarking from the vehicle by means of a portable step that the driver would place at the door of the vehicle in order to facilitate Love's step onto the curb in front of her home. Love fell while alighting from the van and was seriously injured. Love claimed that her injuries were caused by the driver's negligence and that the city was not immune from suit because of the motor vehicle exception to the Tort Claims Act.

The Supreme Court noted that neither the Tort Claims Act nor the general definition section of the consolidated statutes defined the word 'operation'. The Supreme Court determined, based upon the legislature's intent to shield local agencies from tort liability, that "we are constrained to strictly construe the crucial term, i.e., 'operation'." *Id.* at 532. In determining the meaning of 'operation' within the Tort Claims Act, the Supreme Court found that "to operate something means to actually put it in motion," and further stated that its interpretation of the term was "the common and approved usage of the word 'operation.'" *Id.* at 533. Thus, the Supreme Court declined to apply the motor vehicle exception, as the van in which Love was exiting was not moving at the time of her fall and, thus, was not in operation within the meaning of the Tort Claims Act. *Id.*

Our court in *Speece v. Borough of N. Braddock*, 145 Pa.Cmwlth. 568, 604 A.2d 760 (1992), declined to apply the motor vehicle exception to a case where Speece, a bystander, was seriously injured when a fire hose attached to a fire company's truck burst, swung loose and struck him. Our court determined that, although parts of the fire truck were moving at the time Speece was injured, such movement could not be considered "operation" because "both fire trucks were in stationary positions and were being used as pumping stations to extinguish the fire." *Id.* at 762.

Further, in *Swartz v. Hilltown Twp. Vol. Fire Co.*, 721 A.2d 819 (Pa.Cmwlth. 1998), Ruth Swartz was seriously injured after a valve attached to the bumper of a fire truck fell onto the traveled roadway while the fire truck was driving along the road. A motorist drove over the valve and lost control of his vehicle, causing him to collide with Swartz's vehicle. Our court held that although the valve fell into the roadway while the fire truck was in motion, "Swartz's injuries were not caused by the movement of either the fire engine or its parts.... Once the valve fell from the fire engine, the valve remained a stationary object in the road for an undetermined amount of time before being struck by [the other motorist's] car. Ruth Swartz was

then injured when [the other] vehicle crossed lanes and collided with her vehicle." *Id.* at 822.

Appellant contends that *Swartz* is similar to the present controversy as, in *Swartz,* but for the movement of the fire truck along the roadway, which caused the valve to fall, Swartz would not have been injured and in the present controversy, but for Sabatine discharging Appellant on the side of the road opposite his home, he would not have been injured. Appellant requests we re-examine our definition of "operation of a motor vehicle," in cases involving serious and permanent injuries, like Appellant's. Appellant urges that we adopt Justice Newman's reasoning in her dissent in *Warrick v. Pro Cor Ambulance, Inc.,* 559 Pa. 44, 739 A.2d 127 (1999), wherein she stated:

> I believe that it is impossible to look at the term "operation" of a motor vehicle in a vacuum and ignore the purpose for which the vehicle is operated, particularly where, as here, the sovereign is acting as a common carrier in the operation of its vehicle.... The determination that the motor vehicle exception is limited to an injury that results from "the movement of the bus or by any moving part of the bus" is much too narrowly drawn. The process of operating a vehicle encompasses more than simply moving the vehicle. When a person "operates" a vehicle, he makes a series of decisions and actions, taken together, which transport the individual from one place to another. The decisions of where and whether to park, where and whether to turn, whether to engage brake lights, whether to use appropriate signals, whether to turn lights on or off, and the like, are all part of the "operation" of a vehicle.

*Id.* at 47, 739 A.2d at 128.

Our court recently upheld its determinations regarding the term 'operation' of a motor vehicle in *Mannella v. Port Authority of Allegheny County,* 982 A.2d 130 (Pa.Cmwlth.2009). In *Mannella,* Anthony Mannella alleged that a Port Authority (Authority) bus driver negligently deployed the bus wheelchair ramp unevenly with the ground without properly securing it, causing him to fall out of his wheelchair and sustain serious injuries. The Authority filed a motion for summary judgment, contending that Mannella's injuries did not fall under the motor vehicle exception to immunity as the bus and/or the ramp was not in operation at the time of the incident. The trial court denied the Authority's motion, this court reversed the trial court. This court stated that:

> [w]e have declined to apply the vehicle liability exception in cases that did not involve the actual movement of the vehicle, including in the area of public transportation, consistently holding that a passenger's act of alighting from the steps of a bus does not involve the "operation" of a bus for purposes of the vehicle liability exception to sovereign immunity.

*Id.,* 982 A.2d at 133. We further stated that we have "consistently held that to fall within the vehicle exception, the injuries must be caused by a moving vehicle or a moving part of that vehicle. Because neither the bus nor the wheel chair ramp was moving at the time of the accident, the vehicle liability exception did not apply." *Id.,* 982 A.2d at 134.

After reviewing the current state of the law, this Court is unable to grant the Appellant's request to expand the case law definition of the word "operation" in Section 8542(b)(1) of the Tort Claims Act. The trial court did not err in determining that the motor vehicle exception to the Tort Claims Act did not apply in the present

controversy, as the bus was not moving when Appellant's accident occurred. Appellant's request to broaden the definition of the term "operation" is denied.

■ Further, Sabatine is entitled to the defense of official immunity from suit because his actions were within the course and scope of his employment as a van driver for WCAS. The Tort Claims Act grants employees immunity from suit for their official acts and Appellant must first prove that the employee's conduct falls within one of the eight exceptions to immunity. *Lancie v. Giles,* 132 Pa.Cmwlth. 255, 572 A.2d 827 (1990). *See* 42 Pa.C.S. § 8546.

It is undisputed that the actions of Sabatine in transporting Appellant arose from or were reasonably related to the performance of his duties as a driver employed by WCAS and that he reasonably believed that his conduct was authorized by law. The Tort Claims Act precludes the imposition of liability on the local agency unless the act falls under one of the eight recognized exceptions to the Tort Claims Act. In this case, the claims brought against Sabatine, as well as his employer, do not come under any of the exceptions to the Tort Claims Act. Thus, the immunity enjoyed by Sabatine is abrogated only if there is a judicial determination that the act of the employee caused the injury and that such act constituted a "crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S. § 8550. A review of the record reveals no evidence that Sabatine's conduct involved a crime, actual fraud, actual malice or willful misconduct. The trial court was correct in making such finding. The trial court was correct in granting WCAS, Sabatine and WCTA's motions for summary judgment.

■ Next, Appellant contends that the trial court erred when it held that SPAAA could not be held liable for Appellant's injuries because Sabatine was acting as an independent contractor vis-à-vis SPAAA, because the duty of SPAAA to provide safe transport of Appellant was non-delegable. Pursuant to the July 1, 2004 contract between SPAAA and WCAS, WCAS agreed to "deliver transportation services at the direction" of SPAAA and that "drivers must provide door-to-door service." R.R. at 474a, 480a. Although the trial court found that Sabatine was an independent contractor of SPAAA, SPAAA can still be held liable for Sabatine's negligence.

A non-delegable duty is "[a] duty that may be delegated to an independent contractor by a principal, who retains primary (as opposed to vicarious) responsibility if the duty is not properly performed." Black's Law Dictionary 581 (9th ed., 2009). Appellant argues that the contract provision stating that WCAS was an independent contractor is immaterial to the question of SPAAA's liability. Having undertaken to provide transportation services to Appellant, at the time a known retarded person, SPAAA cannot escape liability for the negligent provision of those services by WCAS and Sabatine. Appellant cites *Leonard v. Commonwealth,* 565 Pa. 101, 110, 771 A.2d 1238, 1243 (2001), which states that non-delegable duties "are considered so important to the community that the employer cannot discharge these duties by simply delegating performance to another." However, this cite is from the dissenting opinion in that case. The majority opinion reiterated a longstanding line of cases which held that:

> [t]he mere fact that contracts initially placed responsibility on [the general contractor] does not make that responsibility non-delegable; nor does it give them a presumed presence at the site or control over the manner in which the subcontractor performed its work. To

hold otherwise would mean that one could subcontract for the performance of work but not successfully delegate the safety responsibility that normally accompanies that work. Logically, safety responsibility best rests on the subcontractor doing the work, for that party is most familiar with the work and its particular hazards.

*Id.,* 771 A.2d at 1242.

The trial court determined that SPAAA employed WCAS as an independent contractor through its agreement and that Sabatine would also stand as an independent contractor because of that agreement. "One who employs an independent contractor is not liable for physical harm caused by a negligent act or omission of the contractor." *Dunkle v. Middleburg Municipal Authority,* 842 A.2d 477, 481 (Pa.Cmwlth.2004). As Sabatine was an independent contractor and SPAAA was not responsible for his hiring, training or for supervising his work, the trial court found that the use of the independent contractor does not make the employer liable for the independent contractor's negligent actions.[8]

In *Dunkle,* the parents of William K. Dunkle, the decedent, appealed from the trial court's order granting summary judgment for the municipal authority in a wrongful death action. Dunkle was asphyxiated when a sewer trench he was working on while employed by Gutelius Excavating, Inc. collapsed and buried him. The authority had hired Gutelius to excavate the trench. Our court upheld the trial court's grant of summary judgment stating that "one who employs an independent contractor is not liable for physical harm caused by a negligent act or omission of the contractor." *Id.* at 481. This court noted that the exception to this general rule, regarding special dangers and peculiar risks, was not applicable because the excavation of the sewer trench was not of such a peculiar risk to invoke the exception. We stated that "[h]ere, the type of trenching contemplated in the subcontract presented no peculiar risk or inherent danger. Rather, the risk or danger arose out of a failure to use standard precautions." (Emphasis omitted). *Id.* at 483. We then concluded that, because the type of trenching undertaken did not pose a peculiar risk or danger, the authority, as the employer, could not be held vicariously liable for the tortious conduct of its contractors.

In *Dunkle,* we cited the following test for determining whether a particular activity presented a special danger or peculiar risk:

(1) Was the risk foreseeable to the employer of the independent contractor at the time the contract was executed?; and

(2) Was the risk different from the usual and ordinary risk associated with the general type of work done, i.e., does the specific project or task chosen by the employer involve circumstances that were substantially out-of-the-ordinary?

*Id.* at 482. We concluded that the trench digging operations in *Dunkle* failed to meet the test and noted that the "peculiar risk must be one *not* created solely by the contractor's negligence in performing the operative details of the work." (Emphasis in original). *Id.*

In the present controversy, the activity of providing transportation services is not

---

8. Sabatine was employed by WCAS and was under its direct control and supervision. WCAS was contracted by SPAAA to provide transportation services for the WCTA. Under the agreement between WCAS and SPAAA, WCAS was deemed to be an independent contractor and, as such, was "fully responsible for all acts and omissions of its employees, subcontractors. . . ." R.R. at 107a.

the type contemplated by courts or the Restatement of Torts as involving a "special danger or peculiar risk," nor does the alleged negligence of a subcontractor make it a peculiar risk. Moreover, Sabatine was provided training by his employer, WCAS, in the manner in which he was to discharge his duties of providing transportation. R.R. at 496a–498a. Sabatine admitted that he deviated from this training, ostensibly at the request of Appellant himself. R.R. at 499a–500a. The loss at issue could not be viewed as having been the result of a failure on the part of Sabatine's employer or other entities engaging their services to provide necessary training for him. However, even if Sabatine was found negligent for deviating from his training, such negligence on his part cannot be imputed to SPAAA based on the holding in *Dunkle*.

In *LaChance v. Michael Baker Corp.*, 869 A.2d 1054 (Pa.Cmwlth.2005), our court upheld the grant of summary judgment stating that LaChance did not show that the agency retained and exercised sufficient control over the work of the independent contractor to be held liable for the manner and operational details of the trenching. LaChance attempted to assert the "retained control exception", claiming that the general contractor had retained certain control over the project site and that in so doing, it failed to exercise that control reasonably. In affirming the trial court, we held that "mere supervision over the work of a subcontractor, up to and including the right to stop a project, is not

control sufficient to impose liability." *Id.* at 1058.

In the matter before us, SPAAA provided guidelines to its independent contractor, WCAS, and set forth in the Agreement the procedures to follow for its transportation services. This is not the type of control that approaches the level that would be considered intrusive under the standards set forth above. As Spilak testified, WCAS had total control over its day-to-day operations, as well as its employees. Thus, Appellant failed to establish vicarious liability against SPAAA.[9]

Accordingly, we affirm the decision of the trial court.

### ORDER

AND NOW, this 14th day of December, 2009 the order of the Court of Common Pleas of Washington County in the above-captioned matter is affirmed.

---

**9.** SPAAA also argues that it is immune from liability under the Tort Claims Act. The trial court did not address this issue as it found that SPAAA could not be held vicariously liable and granted summary judgment based upon that finding.

SPAAA is a local agency within the meaning of the Tort Claims Act and therefore en-

joys the immunities afforded thereunder. As mentioned previously, Sabatine's actions do not fall under the motor vehicle exception to the Tort Claims Act and therefore Sabatine's actions were immune from suit. As such, SPAAA enjoys governmental immunity as well.