Michael **IREY** and Tara Irey,
h/w, **Appellants**

v.

**COMMONWEALTH of Pennsylvania,
DEPARTMENT OF TRANS-
PORTATION.**

Commonwealth Court of Pennsylvania.

Argued May 15, 2013.
Decided June 28, 2013.

Michael D. LaRosa, Havertown, for appellants.

Claudia M. Tesoro, Senior Deputy Attorney General, Philadelphia, for appellee.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

Appellants Michael and Tara Irey (Plaintiffs) appeal from an order of the Court of Common Pleas of Delaware County (trial court), which, following a jury verdict in favor of the Commonwealth of Pennsylvania, Department of Transportation (DOT), denied Plaintiffs' post-trial motion for a new trial or judgment *non obstante veredicto* (n.o.v.). We now reverse.

Plaintiffs filed a complaint against DOT in the trial court on December 30, 2008, raising causes of action for negligence and loss of consortium. Specifically, Plaintiffs alleged that DOT's negligence in allowing water to accumulate on a state highway, approaching the Governor Prince Bridge (Bridge),[1] caused Plaintiff Michael Irey

---

1. The Bridge connects the City of Chester with Nether Providence Township. (Notes of Testimony (N.T.), March 21, 2011 at 166.) We will refer to the area of the accident—*i.e.*,

(Mr. Irey) to lose control of his vehicle.[2] Consequently, Mr. Irey's vehicle collided with another vehicle. Plaintiffs further alleged that "as a direct and proximate result of the accident, Mr. Irey suffered severe and serious injuries that are permanent in nature." (Certified Record (C.R.), Complaint at ¶ 16.) Plaintiffs alleged that DOT had notice of flooding at the Subject Location prior to the accident. (C.R., Complaint ¶¶ 7, 13.) Also, Plaintiff Tara Irey (Mrs. Irey) alleged in the complaint that her husband's injuries arising out of the accident deprived her of his "assistance, society, comfort and companionship." (C.R., Complaint ¶ 35.) DOT filed an answer denying Plaintiffs' allegations and raising new matter.

The trial court conducted a three-day jury trial, during which Plaintiffs called several witnesses relevant to the issues now on appeal. First, Mr. Irey testified on his own behalf. Mr. Irey testified that on November 12, 2006, at around 7:30 p.m., he was driving on S.R. 320, also known as South Providence Road, approaching the Bridge in the direction of Chester, when his car hit standing water at the Subject Location. (Notes of Testimony (N.T.), March 21, 2011, at 67, 69–70, 73–75.) Specifically, Mr. Irey testified:

> As I approached the area I again—I felt my car, basically lose control of my car. The rear-end started to slide out to the left a bit. I tried to correct that with my steering. And as a result, I guess I over-corrected or what have you. But the car[']s rear came back to the right. At which time I just remember the collision with Miss Carr's vehicle.

(Id. at 74.) At the time of the accident, Mr. Irey's car crossed into the oncoming travel lane—the wrong side of the road. (Id. at 85–86.)

Also, at the time of the accident, Mr. Irey was working as a detective, with the rank of sergeant, for the Nether Providence Township Police Department (Township Police Department) and was operating his undercover police vehicle, a 2000 Mercury Sable. (Id. at 55–56, 72.) According to Mr. Irey's testimony, the car was in good condition. (Id. at 149.) Particularly, Mr. Irey testified that he thought that the tires were in an appropriate condition for driving. (Id.)

Mr. Irey further testified that on the night of the accident, it was dark and raining heavily. (Id. at 72, 75, 149–150.) His windshield wipers were on high speed. (Id.) The headlights were on. (Id. at 73.) He was paying attention to the roadway. (Id. at 75.) Indeed, Mr. Irey testified that he was driving over twenty-five and under thirty-five miles per hour—i.e., not speeding—on S.R. 320.[3] (Id. at 81, 102, 150.)

Recalling the accident, Mr. Irey testified that, in his opinion, the depth of the water caused the collision. (Id.) He also testified that he could not see the water before hitting it. (Id.) Mr. Irey further testified that "I [do not] believe I [have] ever seen a pool of water like I saw that night." (Id. at 84.) Despite occasionally having driven on S.R. 320, he testified that he had been unaware of any kind of flooding problems in the area prior to the accident. (Id. at 84–85.)

State Road 320 (S.R. 320) approaching the Bridge in the direction of Chester—as the "Subject Location."

**2.** Plaintiffs averred that DOT was negligent in designing, constructing, maintaining, repairing, or controlling the Bridge and its drainage system. (Certified Record (C.R.), Complaint at ¶¶ 12–15.)

**3.** Mr. Irey was unable to recount the speed of his car at the time of impact with the standing water or while his car was spinning out of control. (N.T., March 21, 2011, at 91.)

Two days after the accident, doctors diagnosed Mr. Irey with a broken neck. (*Id.* at 107.) As a result of the broken neck, Mr. Irey had to wear a metal halo brace, the application of which required four screws in his head, until January 10, 2007. (*Id.* at 109–14.) Mr. Irey testified that having a halo brace was extremely painful and that he "would [not] wish it on [his] worst enemy." (*Id.* at 113.)

On cross-examination, Mr. Irey reaffirmed his denial of ever having seen water accumulation on S.R. 320. (*Id.* at 140.) Mr. Irey acknowledged having received formal training to drive under various weather conditions. (*Id.* at 141.) Additionally, he testified that, as a licensed Pennsylvania driver, he was familiar with the legal requirements for operating a motor vehicle. (*Id.* at 142.) Indeed, Mr. Irey agreed "that motor vehicle operators are supposed to drive [their] car[s] with due regard to the weather and be able to bring their car[s] into a stop within the short, clear distance ahead of them." (*Id.*) Mr. Irey also testified that he did not remember whether he had taken his "foot off the gas" or whether he had applied the brakes when the car hit the standing water. (*Id.* at 142–43.) Mr. Irey also agreed that, undoubtedly, the light standards above the Bridge were working on the evening of the accident. (*Id.* at 143.) Finally, Mr. Irey agreed that, since becoming a detective in 2003, he had, on average, travelled three times per month over the Bridge. (*Id.* at 151.)

Next, Sergeant Paul Battinieri of the City of Chester Police Department, the investigating officer at the time of the accident, testified. (*Id.* 156–57.) Sergeant Battinieri testified that he had filled out an accident report, in which he depicted Mr. Irey's car hitting a "large pool of standing water on the Nether Providence Township side of the [Bridge]." (*Id.* at 157, 163.)

Sergeant Battinieri specifically testified that, after hitting the "large puddle of standing water," Mr. Irey's car "hydroplane[d], lost control." (*Id.*) He also testified that Mr. Irey's car came to rest in the middle of the S.R. 320 Bridge, approximately 100 feet from the standing water, after it collided with another vehicle in the opposite lane. (*Id.* at 166, 172–73.) Sergeant Battinieri testified that he considered the Subject Location a problem area, because he had seen standing water there on other occasions prior to the accident. (*Id.* at 167–68.) Specifically, he testified that "the water ends up like that or worse. You know, rain, storm, whatever. There's a large hill on the north side of this bridge where all the running water comes and it sits there." (*Id.* at 168–69.) Sergeant Battinieri testified that in his estimation, the standing water was eight to ten feet wide. (*Id.* at 173.) Finally, Sergeant Battinieri testified that he personally had not investigated any other accidents at the Subject Location. (*Id.* at 174.)

Tamika Carr, the driver of the other car involved in the collision, testified. Ms. Carr testified that it was raining at the time of the accident. (*Id.* at 177.) She also testified that she "could see lights approaching [her] as [she] was going down towards Swarthmore. And a car swerved once, then [it] swerved again. And then [it] started hydroplaning. And that [is] when [it] hit [my car] head on." (*Id.*) Specifically, she testified that "[she] had lights coming towards [her]. And [the car] hit [her] hard enough that [she] went backwards." (*Id.* at 178.) Ms. Carr testified that, at times when it rained prior to the accident, she had seen flooding or standing water at the Subject Location. (*Id.* at 180.) Indeed, she testified that she could see standing water from her vantage point on the night of the accident. (*Id.* at 181.) Finally, she testified that whenever there

was substantial rainfall, water would accumulate at the Subject Location. (*Id.*)

Sergeant Richard E. Slifer of the Township Police Department testified on Plaintiffs' behalf. (N.T., March 22, 2011, at 5.) He testified that, throughout the twenty-seven years that he has been on the police force, the Subject Location has had a flooding problem. (*Id.* at 7.) Particularly, Sergeant Slifer testified that when leaves and debris would clog the drainage system, flooding would occur at the Subject Location. (*Id.* at 7, 36.) Indeed, the flooding, according to Sergeant Slifer's testimony, was an annual event that generally occurred from October through December. (*Id.* at 8.) Sergeant Slifer identified three occasions—since the computerization of Township Police Department's records—where the department had filled out an incident report relating to flooding at the Subject Location and had notified DOT about the flooding. (*Id.* at 21–25, 32.) He finally testified that, while he could not speak for other officers in his department, he regularly and customarily travelled on S.R. 320 and on the Bridge when on patrol duty. (*Id.* at 34–35.) In fact, Sergeant Slifer testified that whenever he travels on the Subject Location, he anticipates flooding when it is raining. (*Id.* at 42.) To avoid standing water, Sergeant Slifer testified that he moves the car toward "the center of the road like everybody else." (*Id.* at 43.) Also, during his testimony, DOT's attorney challenged Plaintiffs' attorney's introduction of photographs illustrating the spraying of water from a truck at the Subject Location. (*Id.* at 9.) The trial court sustained the challenge, concluding that the photographs were irrelevant because they were not taken in conditions substantially similar to the conditions in which the accident occurred. (*Id.* at 11–12.)

Officer Michael Markunas of the Township Police Department testified next. Officer Markunas testified that, prior to the accident, he was aware of flooding problems at the Subject Location. (*Id.* at 49.) He testified that he had filled out an incident report on November 16, 2005, documenting flooding at the Subject Location.[4] (*Id.* at 49–51.) Subsequently, he had county dispatch contact DOT regarding conditions at the Subject Location. (*Id.* at 51.) Finally, in describing his experience with flooding at the Subject Location, Officer Markunas testified:

> There's been times where I've had to take evasive action to avoid, where the roadway hasn't completely been flooded over, on the middle of the roadway where it crests at the median. And I can make it through where I've had to take evasive action to keep from going through the puddle. Because it will flood up to the curb line. And the curb line's pretty high. So it's—there's been times where I've had to take evasive action to avoid losing control within this area.

(*Id.* at 52–53.)

Christopher Fox testified next. He testified that, for twelve years, he has been living near the site of the accident and, in fact, can see the Subject Location from his house. (*Id.* at 61–62.) Mr. Fox testified that it usually floods near the Bridge on both sides of S.R. 320, because the Bridge is located at the bottom of two hillsides. (*Id.* at 63.) Indeed, S.R. 320 flooded three to five times per year prior to the accident. (*Id.* at 65.) In describing motorists' visibility of standing water at night when approaching the Bridge, Mr. Fox testified:

---

4. Officer Markunas testified that the Bridge itself was clear of water. Flooding only occurred on the road just before the Bridge. (N.T., March 22, 2011, at 58.)

Yeah. I mean, as you can see, it's fairly flat and open. And I think, you know, the majority of the people that live around that know that that's an area that floods consistently. But, like I said, it's flat and open. So you have a pretty good view of it from—especially if you're coming from Chester heading north. Whereas if you're coming from the opposite way, you're coming down the hillside that curves, maybe [seventy-five] yards before the [Bridge]. So you might not get as much of a warning coming—heading south.

(*Id.* at 66.) He also testified that he has never seen S.R. 320 flooded to the point where traffic could not cross it. (*Id.* at 68.) Finally, Mr. Fox testified that he has witnessed DOT's crews clearing the drains on S.R. 320 to clear the roadway of standing water. (*Id.* at 69–70.)

Officer Kevin Smith testified after Mr. Fox. Officer Smith testified that he has been working as a patrolman for the Township Police Department for twelve years and that he has encountered standing water at the Subject Location. (*Id.* at 73–74.) Specifically, Officer Smith testified that he filled out an incident report on November 28, 2003, documenting flooding at the Subject Location about which he had notified DOT. (*Id.* at 74.) Officer Smith also testified that he had witnessed flooding on several occasions prior to the accident at the Subject Location. (*Id.* at 75.) Given his experience and knowledge of flooding on S.R. 320, Officer Smith testified that he was prepared for standing water on the roadway whenever he was dispatched to the Subject Location. (*Id.* at 76.)

Next, Daryl Dixon testified for Plaintiffs. Mr. Dixon testified that he works for the Nether Providence Township Department of Public Works. (*Id.* at 81.) He testified that he was familiar with standing water at the Subject Location. (*Id.* at 81–82.)

Following Mr. Dixon's testimony, Sergeant Michael Montgomery testified. Sergeant Montgomery testified that he works for the Township Police Department and that, on November 22, 2002, he had filled out an incident report relating to flooding on S.R. 320 approaching the Bridge. (*Id.* at 106–07.) He testified that a drainage problem had caused the flooding, notification of which he provided to DOT. (*Id.* at 107–08.) Sergeant Montgomery also testified that he had grown up near the area of the accident and that he generally was familiar with the Subject Location. (*Id.* at 111–12.) He testified that whenever there was heavy rain prior to the accident, the Subject Location would flood because sticks and debris would clog the drainage system. (*Id.* at 110–11.) Sergeant Montgomery also testified that "everybody knows there's certain areas that puddle." Specifically, in his experience, the Subject Location was a bad area if there had been heavy rains. (*Id.* at 112.) Finally, he testified that, to avoid standing water in the area, he exercised caution. (*Id.*)

Mr. Irey's passenger, Officer George Moore, testified next. Officer Moore testified that he works as a police officer for the Upper Providence Township Police Department. (*Id.* at 132.) He testified that he was sitting in the rear seat behind Mr. Irey. (*Id.*) Officer Moore testified that he had very little recollection of what transpired prior to the accident. (*Id.*) Finally, Officer Moore testified that he had not been familiar with standing water at the Subject Location prior to the accident. (*Id.* at 137.)

Following Officer's Moore testimony, the trial court entertained a sidebar discussion with the parties' attorneys. During the discussion, Plaintiffs' attorney asked the trial court to put on record its

pre-trial ruling on Plaintiffs' motion in limine regarding incident reports that were generated after the accident. (*Id.* at 138.) Concluding that the subsequent incident reports would be cumulative, the trial court reaffirmed its earlier ruling by denying Plaintiffs' motion in limine. (*Id.* at 143.) Also, the trial court excluded evidence regarding an accident that occurred at the Subject Location after Mr. Irey's accident. (*Id.* at 151.) The trial court reasoned that the subsequent accident was too dissimilar. (*Id.* at 151–52.)

Following the discussion, Plaintiffs' expert, civil engineer Russell J. Kolmus, testified. Mr. Kolmus testified that the posted speed limit on S.R. 320 at the time of the accident was thirty-five miles per hour. (*Id.* at 166–67.) Mr. Kolmus opined that "the drain was inadequate to handle flows from [the] roadway for anything less than ideal conditions at this location." (*Id.* at 171.) He also testified that the Subject Location does not comply with standard engineering practice because "the roadway floods at more than half of the travel lane on a regular basis." (*Id.* at 179.)

On cross-examination, Mr. Kolmus acknowledged that "under pristine conditions and if [the drainage system] is perfectly clean," the Subject Location would be capable of handling its water capacity. (*Id.* at 201.) He then testified that, when water encroaches on a roadway, the probability of a vehicle hydroplaning increases. (*Id.* at 212–13.) In explaining the concept of hydroplaning, Mr. Kolmus opined that it takes as little as two-tenths of an inch to three-tenths of an inch of water on the roadway for a vehicle to hydroplane. (*Id.* at 214.) He also testified that "the speed of hydroplaning is dependent on the pressure in the tires." (*Id.*) Mr. Kolmus

opined that, to hydroplane, a typical car needs to have thirty-three pounds of pressure in the tires and a speed of forty-nine miles per hour. (*Id.*) Finally, he opined that, had Mr. Irey's car hydroplaned with thirty-three pounds of pressure in the tires, it would have travelled a distance of 300 to 500 feet. (*Id.* at 220.)

Notwithstanding his explanation of hydroplaning, Mr. Kolmus testified that Mr. Irey's car did not hydroplane.[5] (*Id.* at 214.) He testified that Mr. Irey's car went into a yawl as a result of Mr. Irey's oversteering the car when it impacted the standing water. (*Id.* at 217.) Mr. Kolmus explained that a yawl occurs when a car proceeds down the roadway and rotates about its vertical axis. (*Id.*)

Mr. Kolmus agreed that the distance from the beginning of the Bridge to the center of the Bridge is 150 feet. (*Id.* at 228–29.) He acknowledged that, had Mr. Irey's car hydroplaned, it would have gone more than 300 feet down the road. (*Id.* at 230.) Mr. Kolmus also agreed that Mr. Irey's car ran out of energy when it collided with Ms. Carr's vehicle. (*Id.*)

Finally, John Bush, Assistant County Maintenance Manager for DOT, testified. (*Id.* at 233.) Mr. Bush testified that he oversaw maintenance at the Subject Location around the time of the accident. (*Id.* at 234.) He acknowledged having received notification on November 16, 2005, concerning flooding at the Subject Location. (*Id.* at 246.)

DOT did not call any witnesses to testify on its behalf.

After the trial, the jury returned its verdict, finding in favor of DOT. The jury's verdict sheet provided, in pertinent part:

*QUESTION 1:*

---

5. Later in his testimony, Mr. Kolmus testified that "[s]o now we're experiencing a full friction effect between the car and the roadway. As long as we're not hydroplaning. Which at that point we're probably *not anymore*." (N. T., March 22, 2011, at 220 (emphasis added).)

DO YOU FIND THAT THE DEFENDANT, COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, WAS NEGLIGENT?

YES ___ X ___ NO ___

If your answer is "Yes" to Question 1, then go on to Question 2.

If your answer is "No" to Question 1, then return to the Courtroom.

QUESTION 2:

WAS THE NEGLIGENCE OF THE DEFENDANT, COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, A FACTUAL CAUSE IN BRINGING ABOUT ANY HARM TO THE PLAINTIFF–HUSBAND, MICHAEL IREY?

YES ___ NO ___ X ___

If your answer is "Yes" to Question 2, then go on to Question 3.

If your answer is "No" to Question 2, then return to the Courtroom.

QUESTION 3:

DO YOU FIND THE PLAINTIFF–HUSBAND, MICHAEL IREY, CONTRIBUTORILY NEGLIGENT?

YES ___ NO ___

If your answer is "Yes" to Question 3, then go on to Question 4.

If your answer is "No" to Question 3, then go to Question 6.

QUESTION 4:

WAS THE NEGLIGENCE OF THE PLAINTIFF–HUSBAND, MICHAEL IREY, A FACTUAL CAUSE IN BRINGING ABOUT ANY HARM TO HIM?

YES ___ NO ___

If your answer is "Yes" to Question 4, then go on to Question 5.

If your answer is "No" to Question 4, then go to Question 6.

(C.R., Jury Verdict Sheet.) Thus, although the jury found DOT negligent, it did not find DOT's negligence to be a factual cause of Mr. Irey's injuries. Consequently, the trial court entered judgment in DOT's favor.[6]

Following the jury's verdict, Plaintiffs filed a motion for post-trial relief, which DOT opposed. In particular, Plaintiffs requested judgment n.o.v. or a new trial, arguing, inter alia, that (1) the jury's finding of a lack of causal relationship between DOT's negligence and Mr. Irey's harm was against the weight of the evidence, and (2) the trial court erred in excluding photographs of vehicles passing through standing water, subsequent incident reports and evidence of a subsequent accident at the Subject Location. The trial court issued an order, denying Plaintiffs' post-trial motion. (C.R., trial court's November 1, 2011 order.) Plaintiffs appealed the trial court's order to this Court. The trial court issued an opinion in support of its order in accordance with Pennsylvania Rule of Appellate Procedure 1925(a).

In the opinion, the trial court, in part, addressed Plaintiffs' argument for a new trial based on the weight of the evidence and evidentiary challenges. With regard to the weight of the evidence, the trial court reasoned:

Understandably, and with adequate support in the record, the jury reasonably concluded that [DOT's] negligence (allowing water to pool near a drain) was an "insignificant factor", "a negligible, imaginary or fanciful factor" or "a factor

6. On March 23, 2011, the trial court denied Plaintiffs' motion in limine requesting the use of subsequent similar accidents. (C.R., Item No. 60.) On the same day, it granted DOT's motion in limine requesting the exclusion of subsequent incident reports. (Id., Item No. 62.)

having no connection or only an insignificant connection with [Mr. Irey's] injury", which contributed thereto in a way which was "minimal or insignificant". In a word, the jury rationally concluded "considering all of the circumstances", and based on all reasonable inferences to be glea[n]ed from the evidence, that it was [Mr. Irey's] conduct (*i.e.*, his speed), and not [DOT's] negligent design of the road, which was the factual cause of [Mr. Irey's] injuries. . . .

Nothing [Mr. Irey] can say will change reality. It simply is what it is. Plaintiffs' misperception of the state of the evidence, what it proved or disproved, its effect on the mind of the jury, and the rights of the jury to sift through and make sense of it all are, in a word, insufficient to provide grounds for the granting of a New Trial.

. . . .

The jury's theory that the [Mr. Irey] had not shown by a preponderance of the evidence that the [DOT's] conduct caused him injury was reasonably supported in the evidence and the law and should not be disturbed.

(C.R., trial court's opinion at 12–15.) In addressing Plaintiffs' evidentiary challenges for purposes of a new trial, the trial court concluded that it properly denied Plaintiffs permission to introduce photographs of other vehicles traveling through standing water at the Subject Location, because the photographs were irrelevant and, at best, constituted cumulative evidence.[7] (*Id.* at 15–16.) The trial court noted that Plaintiffs sought admission of the photographs to illustrate the spraying of water that resulted from vehicles' passing through the standing water. (*Id.* at 15) The trial court also concluded that it properly denied Plaintiffs permission to present testimony of a vehicle operator who was involved in a car accident at the Subject Location two years after Mr. Irey's accident. (*Id.* at 16.) Specifically, the trial court held that:

> [w]hile subsequent accident on standing water on state Route 320 might have shown that it was possible for such an accident to take place, as the [trial court] advised Plaintiff[s'] counsel at the trial, it clearly would not be probative of how this particular accident unfolded for lack of corroborating evidence substantiating the myriad of technical factors related to the weather, water, and highway conditions, for example, that would demonstrate substantial similarity to factors that contributed to the occurrence of [Mr. Irey's accident] two years earlier, *including Mr. Irey's conduct.*

(*Id.* at 18 (emphasis added).)

■ On appeal,[8] Plaintiffs argue that the trial court abused its discretion in re-

---

7. The trial court noted that "[i]n any event, besides being baseless, [Plaintiffs'] contention must be deemed waived for being presented as mere boilerplate without appropriate legal argument in support thereof and for lacking citation to the place in the record where the purported error of [the trial court] took place." (C.R., trial court's opinion at 16.)

8. This Court's standard of review of a trial court's denial of a motion for post-trial relief is limited to a determination of whether the trial court abused its discretion or committed an error of law. *Ryals v. City of Philadelphia*, 848 A.2d 1101, 1103 n. 3 (Pa.Cmwlth.2004);

*Williams v. Southeastern Pa. Transp. Auth.*, 741 A.2d 848 (Pa.Cmwlth.1999), *appeal denied*, 563 Pa. 680, 759 A.2d 925 (2000).

To the extent that Plaintiffs attempt to raise an issue relating to the trial court's failure to grant judgment n.o.v., or appear to challenge the adequacy of the jury charge, we decline to address those issues. Plaintiffs waived those issues by insufficiently developing them in the argument portion of their brief. When a party's brief, and specifically the argument section of a brief, is bereft of any legal analysis or citation to court decisions relating to the issues an appellant seeks to have an appellate

fusing to grant a new trial when the weight of the evidence indicates that DOT's negligence was a factual cause of Mr. Irey's injuries. Plaintiffs also argue that the trial court improperly refused to admit at trial (1) testimonial evidence of a subsequent accident at the Subject Location, (2) reports of flooding at the Subject Location after Mr. Irey's accident, and (3) photographs of other vehicles traveling through standing water at the Subject Location.

We first address Plaintiffs' contention that a new trial is warranted because the evidence does not support the jury's verdict on factual cause. In this Commonwealth, "a weight of the evidence claim is primarily addressed to the discretion of the judge who actually presided at trial." [9] *Armbruster v. Horowitz*, 572 Pa. 1, 8–9, 813 A.2d 698, 702 (2002). "[A] new trial should be granted only in truly extraordinary circumstances, *i.e.*, 'when the jury's verdict is *so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'* " *Id.* at 9–10, 813 A.2d at 703 (quoting *Cmwlth. v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994)) (emphasis in original.) "Credibility determinations are within the sole province of the jury." *Martin v. Evans*, 551 Pa. 496, 505, 711

A.2d 458, 463 (1998). "A jury is entitled to believe all, part, or none of the evidence presented [and] can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve." *Randt v. ABEX Corp.*, 448 Pa.Super. 224, 671 A.2d 228, 233 (1996); *see also In re Funds in Possession of Conemaugh Twp. Supervisors*, 562 Pa. 85, 89–90, 753 A.2d 788, 790 (2000) (noting that "the finder of fact is sole judge of credibility and is free to believe all, part, or none of the evidence. This is true of a judge in a bench trial, as well as a jury"). Speculation, however, is not evidence, and a jury may not reach a verdict that is merely predicated upon conjecture. *Fitzpatrick v. Natter*, 599 Pa. 465, 484–86, 961 A.2d 1229, 1241–42 (2008). "[A] mere conflict in testimony will not suffice as grounds for a new trial." *Elliott v. Ionta*, 869 A.2d 502, 504 (Pa.Super.2005). In ruling on a motion for new trial, the court must review all the evidence. *Abbott v. Onopiuk*, 437 Pa. 412, 415, 263 A.2d 881, 883 (1970).

As we previously have recognized in *Phillips v. Washington County Transportation Authority*, 986 A.2d 925 (Pa. Cmwlth.2009), the Pennsylvania Suggested Standard Civil Jury Instructions provide in pertinent part "a complete definition of factual cause":

___

court review, the reviewing court may regard the appellant as having waived his arguments. *D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 742, 750 n. 8 (Pa.Cmwlth.2010) (issue waived where appellant failed to develop legal argument or cite relevant legal authority in support of issue), *appeal denied*, 612 Pa. 693, 29 A.3d 798 (2011); Pa. R.A.P. 2119. Plaintiffs' argument relating to the issue of whether the trial court erred in failing to grant a new trial based upon the weight of the evidence also fails to cite legal authority and is only minimally developed. Nevertheless, we will address it based upon what we can glean from the argument section.

9. In the context of a new trial, our Supreme Court, in *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116 (2000), noted that "[a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Harman*, 562 Pa. at 469, 756 A.2d at 1123. "A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion." *Id.*

In order for the plaintiff to recover in this case, the defendant's [negligence] [reckless] [intentional] conduct must have been a factual cause in bringing about harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.

To be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as [his] [her] own negligence is a factual cause of the injury.

*Phillips,* 986 A.2d at 930–31 (citing *Gorman v. Costello,* 929 A.2d 1208, 1213 (Pa.Super.2007)).

▮▮▮▮▮ Here, in reviewing the entire record, we do not see a scintilla of evidence to suggest that the standing water was not a factual cause of Mr. Irey's harm. In other words, the record is devoid of any other reason or explanation for Mr. Irey's losing control of his car. The parties do not dispute this fact.[10] Indeed, DOT tacitly admits in its brief that Mr. Irey had hit standing water before losing control of his vehicle. (Appellee's br. at 22–23.)

▮▮▮ Plaintiffs suggest that the jury might have incorporated a contributory negligence analysis in determining whether DOT's negligence caused Mr. Irey's

harm. We agree. In this case, contributory negligence refers to the duty that Mr. Irey, as a motorist, had to use state highways "in the ordinary and usual manner with reasonable care." *Glover v. Dep't of Transp.,* 167 Pa.Cmwlth. 87, 647 A.2d 630, 632 (1994), *appeal denied,* 540 Pa. 606, 655 A.2d 994 (1995). It is apparent from the record that not only the jury, but also DOT and the trial court misunderstood the application of contributory negligence. In particular, as noted above, in reasoning why Plaintiffs were not entitled to a new trial, the trial court concluded that "[i]n a word, the jury rationally concluded 'considering all of the circumstances', and based on all reasonable inferences to be gleamed from the evidence, that *it was [Mr. Irey's] conduct (i.e., his speed),* and not [DOT's] *negligent design* [11] of the road, which was the factual cause of [Mr. Irey's] injuries." (C.R., trial court's opinion at 12 (emphasis added).) Similarly, DOT argues in its brief that:

[t]he jury rejected the notion that Mr. Irey's accident was foreordained, due to the presence of pooled water in his path on November 12, 2006. Instead, the jury apparently reasoned, *Mr. Irey's accident occurred because of the way he was driving that evening* (and, conversely, simply would not have occurred if— consistent with what the law requires, *see* 75 Pa.C.S. § 3361—Mr. Irey's speed had been "reasonable and prudent under the conditions" and he had proceeded with due regard for "the actual and potential hazards then existing").

(Appellee's br. at 29–30) (emphasis added). The jury in this case, however, never

10. We emphasize that DOT did not offer any evidence at trial.

11. The trial court focused on DOT's negligent design of the roadway, but, as we noted above, Plaintiffs alleged more. Indeed, they

alleged that DOT was negligent not only in designing, but also constructing, maintaining, repairing, or controlling the Bridge and its drainage system. (C.R., Complaint at ¶ 12–15.)

reached the point in its analysis where the issue of contributory negligence (*i.e.*, Mr. Irey's conduct) was proper, because it found that DOT's negligence was not a factual cause of Mr. Irey's harm. To the extent that the jury considered Mr. Irey's conduct when it analyzed the issue of whether DOT's negligence caused the accident, the jury demonstrated a lack of understanding.[12] The proper inquiry in determining whether DOT's negligence caused Mr. Irey's harm is not what Mr. Irey did or did not do, but whether the accident would have happened but for the standing water. Solely in the context of DOT's negligence and whether it caused Mr. Irey's injury, we do not find *any* evidence of record to suggest that Mr. Irey would have suffered the harm without the standing water. The standing water, therefore, was not an imaginary or fanciful factor having no connection or only insignificant connection with Mr. Irey's harm. Indeed, any finding that something other than the standing water caused Mr. Irey's harm is merely predicated upon conjecture. *Fitzpatrick,* 599 Pa. at 484–86, 961 A.2d at 1241–42. We, therefore, conclude that the trial court abused its discretion in denying Plaintiffs a new trial where the weight of the evidence indicates that the standing water at the Subject Location was a factual cause of Mr. Irey's harm.[13]

Although we rarely overturn a jury's verdict, in this case, the jury unfortunately was confused about the proper analysis of factual cause. Accordingly, with due restraint, we reverse the order of the trial court and remand this matter to the trial court for a new trial.

Judge SIMPSON and Judge McCULLOUGH dissent.

### ORDER

AND NOW, this 28th day of June, 2013, the order of the Court of Common Pleas of Delaware County (trial court) is REVERSED, and the matter is REMANDED to the trial court with instructions that the trial court conduct a new trial.

Jurisdiction relinquished.

---

**12.** DOT's attorney, Allan E. Ells, in his closing remarks may have contributed to the jury's misunderstanding. Mr. Ells specifically asserted:

> The next question is, was the negligence of the Department of Transportation a cause of Mr. Irey's accident. Now I suggest to you that even if you find that there was some super-standard that they [sic] might have technically failed to comply with, that they [sic] were somehow negligent, that that negligence had nothing to do with Mr. Irey's accident. The water didn't cause the

accident. *Mr. Irey caused the accident.* And that you should answer that question no also.

(N.T., March 23, 2011, at 60–61 (emphasis added).) Indeed, Mr. Ells, *inter alia,* emphasized to the jury that Mr. Irey was distracted and driving too fast for the conditions. (N.T., March 23, 2011, at 44–47.)

**13.** Based on the outcome of this case, we need not address Plaintiffs' remaining arguments.